# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 15-843

**STATE OF LOUISIANA**

**VERSUS**

**ERIC JOHNSON**

**AKA/ERIC DWAYNE JOHNSON**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR 139651
HONORABLE DAVID MICHAEL SMITH, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**JOHN D. SAUNDERS**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Jimmie C. Peters, and David Kent Savoie, Judges.

**AFFIRMED.**

**Edward John Marquet**
**Louisiana Appellant Project**
**Post Office Box 53733**
**Lafayette, LA 70505-3733**
**(337) 237-6841**
**COUNSEL FOR DEFENDANT/APPELLANT:**
      **Eric Johnson**

**Alan P. Haney**
**Assistant District Attorney**
**P. O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
      **State of Louisiana**

**SAUNDERS, Judge.**

By bill of indictment dated November 28, 2012, the State charged Eric Dwayne Johnson (hereinafter "Defendant") with terrorism in violation of La.R.S. 14:128.1. The State alleged that Defendant "did wilfully [sic] and unlawfully intimidate or coerce the civilian population, or influence the police of a unit of government by intimidation or coercion, or affect the conduct of a unit of government by intimidation or coercion[.]" On September 29, 2014, the State filed an amended bill of information charging Defendant with inciting to riot in violation of La.R.S. 14:329.2, alleging that on or about May 18, 2012, in the Parish of Lafayette, Defendant:

> [D]id incite or procure another person to create or participate in a riot by assembling three or more persons to act together or in concert which by tumultuous and violent conduct, or the imminent threat of tumultuous or violent conduct, results in injury or damage to persons or property or creates a clear and present danger of injury or damage to persons or property to-wit: causing the death of one RAY RYAN . . . .

On February 25, 2015, a jury found Defendant guilty of inciting to riot resulting in death. The court sentenced Defendant to sixteen years with credit for time served. Defendant now appeals his conviction based on the State's failure to provide sufficient evidence to prove his guilt beyond a reasonable doubt.

## FACTS:

Defendant asserts that on May 17, 2012, he was jumped and severely beaten by individuals known as "the Crowley boys." As a result, he "decided to confront" the boys for "a fair fist fight" the next night. En route to the apartment where the boys apparently lived, Defendant was joined by Lee Hill. Defendant asserts that Lee Hill armed himself "without encouragement or procurement" by Defendant, and that Hill acted on his own when he began firing a gun indiscriminately outside

the residence of the Crowley boys. Defendant acknowledges the shooting "may have resulted in the death of Ray Ryan."

**ASSIGNMENT OF ERROR:**

Relying on *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), Defendant submits that the State failed to provide evidence sufficient to support his conviction for inciting to riot resulting in death. The analysis for this type of claim is well-established:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Defendant notes that he was cooperative throughout the investigation of the matter and that the court acknowledged at sentencing that he was never accused of pulling the trigger of the gun that killed the victim. He contests the State's theory that he was the leader of a "crew" that brought the deadly incident to the home of the Crowley boys. He also highlights the dearth of witnesses called by the State, having called only two of the "twenty" eyewitnesses to the incident. Of the two actually called to testify, Defendant describes the first as having "displayed extreme bias and prejudice" toward him. The witness, Teri Johnson, is the daughter of the victim and told Defendant directly from the stand "[a]nd I told you

2

from day one I was going to get you for this and I'm going to keep my word." Defendant asserts that despite the number of witnesses at the scene, "the only person who said that Eric Johnson in any way encouraged or urged anyone that night was Teri Johnson."

The State's other eyewitness was Kenneth McMahon. Defendant highlights his testimony indicating he "never saw Teri Johnson or heard Teri Johnson speak to or approach" Defendant. Further, Defendant contrasts Teri Johnson's testimony with that of McMahon's, as McMahon testified "he never heard Eric Johnson tell anyone to do anything, never commanded anyone to do anything, never told anyone to shoot up the place and never heard Eric Johnson incite anyone to riot."

Defendant concludes the State failed to meet its burden. He contends that the State relied on conclusory statements that he was a leader of a group or crew while providing "no direct testimony" in support of those statements.

The State's brief provides some additional context to the nature of the dispute and resultant shooting. The State submits that the day after Defendant was beaten, he progressively became more upset. The State asserts Defendant "talked to several of his friends and told them that he was going to settle the score on the night of May 18, 2012." The State also asserts Defendant "met up with Lee Hill and informed him of his plans for that night." According to the State, as Defendant approached the residence of the Crowley boys, "[D]efendant met up with at least seven of his friends including Lee Hill." Upon reaching the residence, the Crowley boys refused to come out and shots were fired. In apparent reliance on one of Defendant's statements to the authorities after the shooting, the State indicates that "Lee Hill was shooting erratically" and that "a stray bullet struck the victim Ray Ryan in the chest resulting in his death." The State explains that "several states

3

have similar statutes that have resulted in the conviction of persons for inciting to riot," discussing Kansas and Georgia jurisprudence.

Ultimately, the State concludes that Defendant's trial testimony and statements to law enforcement "provided all the evidence necessary to support [his] conviction." In so declaring, the State highlighted Defendant's admissions about being upset over the fight, being in touch with friends concerning his intent to exact revenge, and being aware of Lee Hill's alleged possession and ultimate use of a firearm. In the State's view, the testimony of other witnesses could be described as lagniappe which served to further undermine the merit of Defendant's assignment of error.

**The Trial**

Teri Johnson was the first witness to testify. She explained that Ray Ryan was her father and that she was living at the Marigny Circle Apartments on May 18, 2012. She was sitting in her vehicle with a woman named Bianca and noticed sheriff's deputies near the apartment of Defendant, who she referred to by his nickname, "Vicious." She stated there were "a lot of vehicles" over by Defendant's apartment and that about five minutes after law enforcement left the area "[a]bout twenty" people walked over towards her apartment and that Defendant "was in the front" of the group, the leader. Once Defendant arrived, Ms. Johnson heard Defendant say things such as "'I'm going to surround you'" in reference to the apartment building and that she responded that her kids were inside. She described the building as containing four apartments and that "the top one was the one they aimed for." She went on to explain that Defendant said, "'[c]ome up the stairs, kick the thing in.'" She said she did not "know what happened" and that there was "a lot of commotion" before Defendant said, "'[t]urn that b**** up, you call the shots'" and that the people led by Defendant then "ate it

4

up." At that point during her testimony, the witness turned to Defendant in the courtroom and said "[a]nd I told you from day one I was going to get you for this and I'm going to keep my word." After an admonishment from the court, the prosecutor asked: "[W]ho was making these orders? Who was barking these orders out?" She answered "Eric Johnson" and identified Defendant in court. After the gunfire, the witness noticed her father was injured by a gunshot through the back, and he quickly died.

On cross-examination, Ms. Johnson again acknowledged that Defendant had been in a fight with individuals who lived in the apartment next to hers. She said she could not name any of the individuals who approached the building with Defendant because she did not know any of them except for Defendant's "old lady." She said she could hear what he was saying, that "[h]e was calling the shots." Defendant apparently ordered those with him to surround the building, however, Ms. Johnson stepped into the fray and the group instead went over to the other side of the building where Defendant "told them to run up the stairs." She said two people ran up the stairs but that she was "not paying attention" and the rest of the group did not surround the building because Defendant had "already commanded some more commands." The people up the stairs tried to kick the door to the apartment in, but eventually they came back downstairs. In response to defense counsel's question as to any other orders given by Defendant, Ms. Johnson said he ordered "them" to "shoot it up." She said "[a] lot of people shot" and that twenty to thirty shots were fired. Ms. Johnson acknowledged she did not know any of the individuals with Defendant, yet disputed defense counsel's suggestion that they may have just followed him to the fight, saying Defendant "brought them." She also said that she did not hear any of the others with Defendant say anything as things progressed. When asked about the number of cars over at

5

Defendant's house prior to the incident, she said she had never seen so many in the parking lot. When pressed further, she said there were "[e]nough" cars, then agreed with counsel's assessment that there were "[a]bout five," "[t]en," and then "[t]wenty" cars.

The State next called Kenneth McMahon. He confirmed that he lived at Marigny Circle on May 18, 2012, and knew the victim, Ray Ryan. In fact, Mr. McMahon and the victim were talking on the evening of the shooting about "[w]hat had happened the night before," in apparent reference to Defendant's fight with the Crowley boys. He testified that on the night of the shooting he saw a group of people. In response to the State's leading question, Mr. McMahon answered that Defendant was "leading" the group and then identified him in the courtroom. Mr. McMahon estimated that twelve to fifteen people were with Defendant. Defendant and others passed him and the victim en route to the apartment and Mr. McMahon became concerned about the safety of his family. He even spoke to Defendant who assured him that Mr. McMahon's family would not be bothered. Mr. McMahon continued: "And then they kept walking. And that's when the gunshots rang out and I took off running." The prosecutor inquired, "so, did some people you perceived to be from Eric Johnson's group, did they shoot up that apartment?" to which Mr. McMahon replied, "[t]hey shot up that apartment." He became separated from the victim while running from the scene. After the chaos, he noticed the victim was down, "barely" alive. The victim died shortly thereafter. In response to another leading question by the prosecutor as to who was "in charge" of the group, Mr. McMahon responded that the group "was all behind what was going on with Vicious." Mr. McMahon affirmed the prosecutor's comment that Defendant was the leader of the group that night.

6

On cross-examination, defense counsel began with questions regarding Mr. McMahon's incarceration pursuant to a subpoena to testify and his criminal convictions. Mr. McMahon described Defendant as someone he had seen around, not as a friend or even acquaintance. Next, he testified that he talked to Defendant the day of the shooting before it occurred as well as after. Mr. McMahon was apparently concerned about the safety of his girlfriend's son, because he had hit Defendant in the back of the head with a gun during the fight the night before. His family also lived in an apartment near the one Defendant intended to confront and expressed his concerns to Defendant. He stated "the Crowley people," as defense counsel put it, "were up in the apartment," and he could hear "them," presumably Defendant and the group, "hollering at them" from outside. No response came from within the apartment. In response to the question "who was doing the hollering from the ground level?" Mr. McMahon said it was "the group" and that he could not hear what Defendant was saying. He explained that the group was essentially calling to fight, but he could not hear exactly who was hollering. The gunshots followed not long after, adding later that "the gunshots started immediately." He agreed with the estimation that this all occurred about twenty to thirty yards from him, and that he observed everything up until he began running from the gunfire. Despite this, he did not recall seeing Teri Johnson or Bianca, nor did he ever see Teri approach Defendant to turn him away. He also did not hear Defendant tell the group to do anything; rather, it was the group yelling. He also testified that in that neighborhood, people fought frequently and resolved problems without calling the police.

On redirect, the prosecutor referenced Mr. McMahon's position on a map compared to Teri Johnson's, raising the possibility that he simply could not see her if she was there.

7

The State's third witness was Detective Marcus Lemaire. Through Detective Lemaire's testimony, the State introduced the death certificate of the victim. It indicated the death was a homicide with a cause of death as "[s]hot by another." With respect to the apartment where the incident occurred, Detective Lemaire's investigation revealed that the shots fired originated outside of and went into the apartment of the Crowley boys. However, only one bullet was found inside the apartment. He added that no shots were found to have been fired from inside the apartment to the outside. The State proceeded to show a number of photographs to the jury as Detective Lemaire explained each, but the record does not clearly indicate which photos are being described at any particular moment. Detective Lemaire explained that different caliber casings were found at the scene, to include "22s and 40 calibers" indicating the use of more than one firearm. After reviewing the photos, Detective Lemaire explained that he spoke with Defendant on July 30, 2012. The State admitted a recording and transcribed copy of the interview conducted by Detective Lemaire with Defendant on that date. The interview resulted from a request of Defendant to speak with the authorities. The State then published the recording to the jury.

Defendant's July 30, 2012 statement was provided to Detective Lemaire and Sergeant Larry Brown. This was Defendant's third statement to the authorities; he alleged he was drunk during the first statement, and did not receive an adequate chance to explain his story during the second statement.

Defendant's statement began with an overview of his version of the story. He explained that the Crowley boys tried to jump his brother-in-law, Kaleb, and that he, too, was jumped. He said that his "people came over" and that "we was going over there ta [sic] fight them" the next night. He explained that the Crowley boys lived at the top of the stairs and that "we went to go walk the stairs to go get

8

'em down to come fight." As he ascended the stairs, Defendant heard shots fired. He was intoxicated and "in awe" but eventually ran away. Detective Lemaire and Sergeant Brown then followed up with questions. Defendant acknowledged that there were six or seven people with him. He said that he, a man named Hearse, Lee Hill, and Kaleb went up the stairs to the apartment, but that he was the last in the line. He said as he walked up the stairs, telling the Crowley boys to come down and fight, he heard shots fired from in front of him. He then heard shots from "each side of [his] head." When asked about Lee Hill's gun, Defendant described it as a "semi-automatic," and looked like a 9 millimeter handgun. Once the gunshots started, Defendant said he took off running. Of those going up the stairs, he said "Lee had the gun." He later added that "Lee just sprout[ed] up out 'o nowhere 'cause he had done fell out with them dudes before." Before the incident, Defendant said he was at his house drinking, and that his girlfriend, her brother Kaleb, Lee, and Devin were talking with him about "whupping [the Crowley boys'] mother f****** a****." He kept drinking and blacked out, and by the time he woke up everyone had left. After he awoke, two men named Phil and David "pull[ed] up" and Defendant said to them "We gonna go whup their a** man." He did see Lee with a gun as he walked over to the apartment. Defendant tried recalling other details but had trouble because he had been intoxicated. Regarding the gun, Defendant said he only heard about it, and saw it for the first time on the stairs, and told Lee, "[w]ell man that's on you." He denied having a close relationship with Lee but understood they had a mutual interest in fighting the Crowley boys. He said that he never even made it to the apartment door because shots were fired first, and not by the Crowley boys, but from in front of him. Later in the conversation, when asked if he was the "leader" of the group of people,

Defendant answered, "[p]er se." He then explained that he was going to fight, and that "everybody" was following him.

On cross-examination, Detective Lemaire acknowledged that the area was "fairly violent" and that the residents often took matters into their own hands instead of calling the police. He identified the Crowley boys involved in the fight with Defendant as Derek Jennings, Howard Abraham, and Demarcus Thomas. A Donkeithan Mallet, son of Kenneth McMahon's girlfriend, was also involved in the previous night's fight. Detective Lemaire interviewed the Crowley boys and they apparently admitted to having had a fight the night before the shooting. They also provided information to the police about who was involved in the shooting. Detective Lemaire also interviewed people from "the crowd" the night of the shooting in developing suspects. However, no one was ever arrested for the victim's murder. Seven individuals were arrested for "terrorism" as it related to the fight resulting in the fatal shooting, including Lee Hill. Detective Lemaire's investigation revealed Lee Hill fired his weapon during the fight, but he could not be linked to the fatal shot because no bullet was recovered from the body. As different types of casings were recovered from the scene, no definitive weapon could be identified. The nature of the victim's wounds did not reveal any information regarding the weapon used. Detective Lemaire stated that he did not know the identity of any other shooters that night. Detective Lemaire did question Lee Hill, who maintained he was in Houston on the night of the shooting. Detective Lemaire did conclude after his investigation that Defendant did not fire any shots from any firearm. He confirmed that only one .22 caliber bullet was found in the apartment, though five or six .40 caliber casings were located on the stairway leading up to the apartment. The first time Detective Lemaire interviewed Kenneth McMahon, he said he saw Defendant with a gun, only to change that

10

portion of his statement later.  After redirect, the State rested, and Defendant's case began with his testimony.

Defendant testified that on May 17, 2012, a group of "eight to ten guys" jumped him and knocked him out.  As a result, he had some lacerations and a dislocated shoulder.  According to Defendant, he did not call the police he did not want to create problems by involving the police or be labeled a "snitch."  He, therefore, decided to fight the Crowley boys to get his "respect back."  When he woke up the next day, he began drinking to the point that he "blacked out."  He admitted that he talked to his friends about the fight, but that after he woke up from passing out, "the guys were all gone."  When he decided to go over to fight, he left his apartment with his girlfriend and brother-in-law, Kaleb. He said he did not call anyone because he did not have a phone, nor did he tell anyone to meet up with him.  Instead, since his friends left while he was passed out, Defendant decided to "handle it" by himself when he awoke.  En route to the apartment, he said kids began following him, then he arrived and began yelling to get the fight started. Then others started to show up, though Defendant denied asking anyone to come help him.  He said Lee came around the corner and ran up the stairs with Hurst.[1] Defendant denied ordering them to run up the stairs to the apartment and said he even warned them that the Crowley boys might have had a gun.  Next, Defendant saw Lee shoot once into the apartment window and others came "out shooting with two or three pistols."  Defendant said he was "still drunk" and "in auto" and ran from the scene.  He denied asking his friends to come meet at his house, and indicated that his intention was to fight one-on-one.  He described his arrest, and how he asked the police to check his hands for "powder burns."  He told the police

---

[1]"Hurst" presumably refers to the same individual referred to as "Hearse" in Defendant's statement admitted into evidence.

11

he had nothing to do with the shooting when he was first arrested. He made another statement to the police in June, but he says he was drunk during that meeting. As a result, he asked to speak to the police again in July to clear things up. He denied having any control over the other individuals, or giving specific orders to do anything. He acknowledged that he "wanted to get a whole bunch of people and trash it up" but that he was unsuccessful in that regard and decided to make it a one-on-one fight.

On cross-examination, Defendant admitted he wanted to fight and to get revenge. He also admitted to having at least three prior felony convictions. He also acknowledged that he knew Lee had a gun, but said he could not stop him from following him when he went to the apartment to fight and that "Lee came up out of nowhere." He affirmed that he and Lee had a mutual interest in fighting the Crowley boys but asserted he told Lee not to bring his gun. After redirect, the defense rested.

**Sufficiency of the Evidence Analysis**

Louisiana law defines a riot as:

[A] public disturbance involving an assemblage of three or more persons acting together or in concert which by tumultuous and violent conduct, or the imminent threat of tumultuous and violent conduct, results in injury or damage to persons or property or creates a clear and present danger of injury or damage to persons or property.

La.R.S. 14:329.1. Here, Defendant was found guilty of "inciting to riot," which is defined as "the endeavor by any person to incite or procure any other person to create or participate in a riot." La.R.S. 14:329.2. Additionally, "[w]here, as a result of any willful violation of the provisions of R.S. 14:329.1-14:329.8, the death of any person occurs, such offender shall be imprisoned at hard labor for not to exceed twenty-one years." La.R.S. 14:329.7.

12

This court's research revealed limited jurisprudence concerning the criminal statutes in question, perhaps indicating why the State chose to include references to Kansas and Georgia precedent. An instructive Louisiana case is *State v. Douglas*, 278 So.2d 485, 487 (La.1973) (footnote omitted), in which the supreme court addressed the question of what kind of speech constitutes incitement:

> Since no one would seriously contend that actual participation in a riot is protected by the First Amendment, it would seem that actions or endeavors or conduct to procure or incite others to riot is no less outside the protection of the First Amendment. For speech to constitute this conduct of inciting to riot, it must be a willful, intentional 'endeavor' to gain as an immediate result, and specifically from that speech, the participation of three or more persons in combination to do violence.

Though Defendant does not cite this specific case, his argument latches on to the premise of the quoted language. Though not disputing that a group of people were at the scene of the incident and participated in creating a disturbance in an effort to instigate a fight, Defendant nonetheless denies any willful or intentional incitement or procurement of any others to join in his personal conflict, much less to fire a weapon. In *Douglas*, the supreme court reversed the defendant's conviction for inciting to riot after he gave a speech at an NAACP rally, after which there were multiple acts of violence throughout the city of Baton Rouge:

> The defendant contends that there is no evidence to prove that he willfully incited to riot, and we agree that there is no evidence. At no time during the trial did the prosecution present any evidence which connected the incidents of violence with the defendant's speech; nor did not evidence presented show that any of the persons responsible for the acts of violence had heard or were motivated by the defendant's speech. No evidence was introduced which even tended to show that the defendant willfully endeavored to incite or procure a riot.

*Id.* at 491. Indeed, most of the evidence in the presence case that Defendant "incited" anything came from Teri Johnson, a witness who made several incredible statements during her testimony. For example, she recalled that Defendant was the

13

*only* vocal party during the events leading up to the shooting. When asked about the cars at Defendant's apartment prior to the incident, she first agreed with defense counsel that there were five cars, then ten, then twenty. She disputed the possibility that people simply joined Defendant during his walk to the Crowley boys' apartment. She asserted, without any apparent basis, that Defendant "brought" everybody over although she knew none of the individuals with him. Portions of her testimony were directly contradicted by the State's other eyewitness, Kenneth McMahon, who did not even see or hear Ms. Johnson at the scene of the incident immediately prior to its occurrence. For example, Mr. McMahon testified that a group of individuals were shouting outside the apartment, not just the Defendant.

Though Ms. Johnson's testimony was questionable at points, her testimony nonetheless provided support for the proposition that Defendant ordered a group of three or more persons to "surround" the apartment (though she claimed to have intervened and prevented such from happening) and that Defendant ordered an unspecified number of people to run up the stairs and later to shoot at the apartment. While Mr. McMahon's testimony did not fully corroborate Ms. Johnson's with respect to Defendant's "orders" or "commands," he did agree with the State's suggestion that Defendant was the leader of the group.

Defendant's statement to the authorities provided some additional support, as Defendant himself admitted that he discussed the fight with several others before it occurred. We cannot say that discussing a fight is necessarily proof of incitement, especially since the fight did not occur immediately thereafter. He often used the word "we" when referring to the anticipated fight, though he claimed to have later decided he would handle the matter on his own. Nonetheless, both Teri Johnson and Kenneth McMahon described a large group, twelve to

14

twenty people, moving towards the scene on the night of the incident. While Defendant recalled walking over with only his girlfriend and her brother, he also claimed to have been heavily intoxicated and had even "blacked out" earlier in the day.

In all, the proof as to Defendant's "procurement" of others left much to be desired and could be described as weak. Ms. Johnson provided the only direct evidence that Defendant gave specific orders to others, but her other testimony raised questions regarding her credibility. Additionally, Ms. Johnson exhibited hostility toward Defendant in the courtroom when she said, "I told you I was going to get you for this." While understandably upset about the death of her father in an entirely senseless act of violence, such an outburst could certainly raise a concern that Ms. Johnson embellished her testimony, especially when contrasted with that of Mr. McMahon, a proclaimed neutral third-party.

> [The supreme court has] repeatedly cautioned that [the] due process, rational fact finder test of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), does not permit a reviewing court to substitute its own appreciation of the evidence for that of the fact finder or to second guess the credibility determinations of the fact finder necessary to render an honest verdict. A reviewing court may intrude on the plenary discretion of the fact finder "only to the extent necessary to guarantee the fundamental protection of due process of law."

*State v. Calloway*, 07-2306, p. 10 (La. 1/21/09), 1 So.3d 417, 422 (citations omitted). "The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness[.]" *State v. Higgins*, 03-1980, p. 17 (La. 4/1/05), 898 So.2d 1219, 1232, *cert. denied*, 546 U.S. 883, 126 S.Ct. 182 (2005). "Credibility determinations are within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence." *State v. Marshall*, 04-3139, p. 9 (La. 11/29/06), 943 So.2d 362, 369, *cert. denied*, 552 U.S. 905, 128 S.Ct. 239 (2007). Rare will be the case where

evidence of "procurement" of any other to riot is clear. Indeed, a riot is by its nature a chaotic episode that may lead to conflicting stories by eyewitnesses. Such was the case here. However, Defendant had the burden of proving that the jury reached a verdict that was "clearly contrary to the evidence." Arguably, the jury simply decided to credit the testimony of Ms. Johnson over that of Defendant, and the court must be careful not substitute its appreciation of the evidence for that of the members of the jury.

We decide to affirm the conviction. While Defendant may be of the opinion that his conviction is unjust because he is the only one to have suffered any criminal consequence for an incident involving many other culpable parties, he is nonetheless also responsible for his own conduct. By his own admission he intended to start a fight on the night in question. Such intention was a precipitating event which lead to the commotion and eventual gunfire resulting in the death of an innocent bystander. While one could believe that Defendant truly did not intend such a tragic result, it does not cleanse Defendant of culpability. Indeed, La.R.S. 14:329.7(C) does not require that the result be intended; it merely requires proof of another's death as a result of a "willful violation" of the statute.

## DECREE:

Defendant's conviction is affirmed. While Teri Johnson's testimony presented some concern regarding her credibility, such determinations are best left to the decider of fact, which in this case was the jury. We find the jury's determination of Ms. Johnson's credibility to be rational. As such, in looking at the proof in the light most favorable to the State, we find that the State proved the essential elements of inciting to riot beyond a reasonable doubt.

**AFFIRMED.**

16