# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 11-1384


**STATE IN THE INTEREST OF**

**D. D.**


**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. JC-20100989
HONORABLE MARILYN CARR CASTLE, DISTRICT JUDGE

**********

## MARC T. AMY
## JUDGE

**********

Court composed of John D. Saunders, Oswald A. Decuir, and Marc T. Amy, Judges.


**AFFIRMED.  REMANDED WITH INSTRUCTIONS.**

**Michael Harson**
**District Attorney**
**Michelle M. Breaux**
**Assistant District Attorney**
**Post Office Box 3306**
**Lafayette, LA   70502-3306**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
        **State of Louisiana**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**Post Office Box 1747**
**Lake Charles, LA   70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
        **D. D.**

**AMY, Judge.**

The State filed a petition charging the juvenile defendant with second degree murder and aggravated battery. After an adjudication hearing, the trial court adjudicated the juvenile as delinquent and imposed a disposition of secure placement until the juvenile attained the age of twenty-one without benefit of parole, probation, suspension of imposition or execution of sentence, or modification of sentence. The juvenile appeals. For the following reasons, we affirm and remand the matter to the trial court with instructions.

## Factual and Procedural Background

After Joseph Nelson died as a result of a single stab wound to his heart, the juvenile defendant, D.D.,[1] was taken into custody. The State filed a petition alleging that D.D. should be adjudicated as delinquent on the basis that he committed second degree murder, a violation of La.R.S. 14:30.1, and aggravated battery, a violation of La.R.S. 14:34. The State subsequently sought to transfer D.D., who was fourteen years old at the time of the incident, to adult court. However, the trial court denied the State's motion to transfer.

A delinquency hearing was held on May 11 and 12, 2011, and June 24, 2011, on the second degree murder charge.[2] The evidence presented at the hearing

_____

[1] Initials are used to protect the juveniles' identities. However, as the victim is deceased, his name will be used. La.Ch.Code art. 811.1(G). *See also* Uniform Rules—Courts of Appeal, Rule 5-2.

[2] According to the record, no formal motion to sever was filed. However, on May 11, 2001, at the adjudication hearing, the following colloquy occurred:

> MS. PREJEAN [attorney for D.D.]: I would move to continue all pending cases to Your Honor's next court date, pending –
>
> THE COURT: You mean other than this one?
>
> MS. PREJEAN: Yes, ma'am. Pending disposition of this case and depending on how this case ends.
>
> THE COURT: Ms. Breaux, are you –

was that, on September 18, 2010, D.D. was hanging out with a group of boys, which included D.K.M., K.M., T.S., D.M., M.M., and the victim, Joseph Nelson. The group was playing basketball and rambling around their neighborhood in Lafayette, Louisiana. All of the boys testified that D.D. was "fussing" with Mr. Nelson. There was testimony that D.D. wanted Mr. Nelson's watch and cell phone. As the boys were walking to a local supermarket, D.D. and Mr. Nelson got into a fistfight after D.D. continued to state that he was going to take the watch and the cell phone. According to the testimony, Mr. Nelson bloodied D.D.'s lip and D.D. lost the fight.

All of the boys, with the exception of D.K.M., testified that, after losing the fight, D.D. left the group and returned with a shotgun. According to those witnesses, D.D. stated that he did not want to shoot Mr. Nelson with the gun, but that he wanted to hit him on the head with it and send him to the hospital. Eventually, some of the group convinced D.D. to put the gun away. D.D. again left the group, but returned a short time later. D.K.M., K.M., and M.M. testified that D.D. was smoking a "blunt," and that D.D. stated something like after he "hit the weed, [he was] going to kill him." There was testimony that D.D. approached Mr. Nelson, pulled a knife out of his back pocket, and started swinging it at Mr. Nelson. Although Mr. Nelson attempted to back away, one of D.D.'s blows connected. According to the testimony, D.D. fled and Mr. Nelson started running

---

MS. PREJEAN: We would – I mean, depending on how this case – Your Honor rules, we may or may not be having a disposition hearing, and I would request that all charges – all pending cases be referred until after such time.

MS. BREAUX[attorney for the State]: I truly have no opposition with that. I would rather handle one at a time.

The trial court then reset all other pending cases for its July 2011 docket. We further note that, at the disposition hearing, the State's attorney listed the remaining charges pending against D.D., including the aggravated battery charge, and informed the trial court that "the State will hold all of these charges." The trial court acquiesced to this request. Accordingly, the record indicates that the trial court granted D.D.'s oral motion to sever. *See* La.Ch.Code art. 873.

2

towards Cameron Street, where he eventually collapsed. Although Mr. Nelson was transported to the hospital, he died as a result of the wound. The autopsy report indicated that Mr. Nelson suffered a single stab wound to the heart.

The trial court adjudicated D.D. delinquent on the count of second degree murder. After a disposition hearing, the trial court ordered D.D. "confined in secure placement until the child attains the age of 21 years, without benefit of parole, probation, suspension of imposition or execution of sentence, or modification of sentence." The trial court also denied D.D.'s request that he receive credit for time served.

D.D. appeals, asserting that:

> 1) The juvenile judge erred in concluding that the State proved that the killing was not justified, as defined in La. Code Crim. P. art. 20.

> 2) The juvenile judge erred in not concluding that D.D.'s voluntary intoxication precluded the presence of specific intent, a necessary element of the crime of second degree murder.

**Discussion**

*Errors Patent*

Although the Louisiana Children's Code is silent as to whether an error patent review is appropriate for a juvenile criminal proceeding, this court has previously found that La.Ch.Code art. 104 and La.Code Crim.P. art. 920 mandate such a review. *See State in the Interest of S.M.*, 11-271 (La.App. 3 Cir. 6/8/11), 67 So.3d 1274; *State in Interest of C.D.*, 95-160 (La.App. 5 Cir. 6/28/95), 658 So.2d 39. We note several errors patent.[3]

First, the petition does not note D.D.'s place of birth as required by La.Ch.Code art. 845. However, this is a defect as to form only. La.Ch.Code art.

---

[3] We observe that, in brief, D.D. asserts that there are two errors patent relating to time delays and sentencing. Finding no error patent in regard to D.D.'s contention regarding time delays, we decline to address that issue herein.

749(B). Louisiana Children's Code Article 748(D) provides that "[f]ailure to comply with formal requirements of this Article shall not be grounds for dismissal of a petition or invalidation of the proceedings unless it results in substantial prejudice." D.D. has not alleged any prejudice as a result of the defect. Therefore, we find this error to be harmless. *See State ex rel. J.W.D., Jr.*, 05-1135 (La.App. 3 Cir. 2/1/06), 921 So.2d 1165.

Second, the record does not indicate that D.D. was informed of his rights when he appeared to answer the petition, as required by La.Ch.Code art. 855.[4] However, D.D. was represented by counsel and denied all the charges against him. The fifth circuit has found that, in those circumstances, "the juvenile's rights were adequately protected and the fact that he was not so advised caused him no prejudice in connection with his rights." *State in the Interest of J.G.*, 94-194, p. 10 (La.App. 5 Cir. 7/26/94), 641 So.2d 633, 639. Thus, we find that any error in failing to advise D.D. of his rights in this case was harmless. *See also State in the Interest of K.G.*, 34,535 (La.App. 2 Cir. 1/24/01), 778 So.2d 716.

Third, the record does not indicate that the trial court informed D.D. of the

---

[4] Louisiana Children's Code Article 855(B) states, in relevant part:

> If the child is capable, the court shall then advise the child of the following items in terms understandable to the child:
>
> > (1) The nature of this delinquency proceeding.
> >
> > (2) The nature of the allegations of the petition.
> >
> > (3) His right to an adjudication hearing.
> >
> > (4) His right to be represented by an attorney, his right to have counsel appointed as provided in Article 809, and his right in certain circumstances authorized by Article 810 to waive counsel.
> >
> > (5) His privilege against self-incrimination.
> >
> > (6) The range of responses authorized under Article 856.
> >
> > (7) The possible consequences of his admission that the allegations are true, including the maximum and minimal dispositions which the court may impose pursuant to Articles 897 through 900.

4

two-year prescriptive period for filing an application for post-conviction relief, as required by La.Code Crim.P. art. 930.8. As stated in *State ex rel. D.J.*, 08-345, p. 15 (La.App. 3 Cir. 8/28/08), 995 So.2d 1, 11, "[a]lthough the Children's Code contains no similar provision, this court has previously held that this notice should be given." Accordingly, the trial court is ordered to provide appropriate written notice to D.D. within ten days of the rendition of this opinion and to file written proof in the record that D.D. received the notice. *See State v. Guillory*, 07-422 (La.App. 3 Cir. 10/31/07), 970 So.2d 670.

Fourth, the record indicates that the trial court denied D.D.'s request for credit for time served. Louisiana Children's Code art. 898(A) requires that "[t]he court shall give a child credit for time spent in secure detention prior to the imposition of disposition." However, because D.D.'s disposition is secure placement is until he has reached the age of twenty-one years, and not for a term of years, we find this error is harmless. *See State in the Interest of D.S.*, 95-1019 (La.App. 5 Cir. 4/16/96), 673 So.2d 1123, *writ denied*, 96-1237 (La. 6/21/96), 675 So.2d 1086.

Finally, the minutes from D.D.'s disposition hearing require correction. The transcript indicates that the trial court imposed "confinement in secure placement until [D.D. reaches] the age of 21 years, without benefit of parole, probation, suspension of imposition or execution of sentence, or modification of sentence." However, the minutes from the disposition hearing indicate that "the court ordered that the juvenile be placed in secured custody until the age of twenty-one (21)." Where the minutes conflict with the transcript, the transcript prevails. *State v. Salameh*, 09-1422 (La.App. 3 Cir. 5/5/10), 38 So.3d 568 (citing *State v. Guillory*, 00-386 (La.App. 3 Cir. 11/2/00), 773 So.2d 794, *writ denied*, 00-3334 (La. 11/9/01), 801 So.2d 362). Accordingly, we remand to the trial court for the limited

purpose of correcting the minutes from the disposition hearing to accurately reflect the transcript.

*Self-Defense*

In his first assignment of error, D.D. contends that the State did not meet its burden of proof regarding D.D.'s assertion of self-defense. A panel of this court discussed the appropriate standard of review in *State in the Interest of J.M.*, 99-136, pp. 2-3 (La.App. 3 Cir. 6/2/99), 742 So.2d 6, 7, stating:

> In a case involving a juvenile, the State has the burden of proving, beyond a reasonable doubt, the commission of the alleged delinquent act. La.Ch.Code art. 883. This burden of proof is no less strenuous than that required in the criminal proceeding against an adult. *State In Interest of Tatom*, 463 So.2d 35 (La.App. 5 Cir. 1985). On review, the standard for due process, fashioned by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is applicable to determine whether the evidence was sufficient to support an adjudication of delinquency in a Juvenile matter. *State In Interest of T.L.*, 514 So.2d 217 (La.App. 5 Cir.1987). Essentially, while we review whether the evidence in support of the adjudication of a Juvenile is sufficient; we must determine, viewing the evidence in a light most favorable to the prosecution, whether any rational trier of fact could find from the evidence adduced, proof of guilt beyond a reasonable doubt. *State In Interest of Wilkerson*, 542 So.2d 577 (La.App. 1 Cir. 1989). Furthermore, it is well settled that appellate review in juvenile delinquency proceedings extends to both law and facts. La. Const. Art. V, § 10(B) (1974); *State In Interest of Batiste*, 367 So.2d 784 (La.1979). In *Wilkerson*, 542 So.2d 577, 581, the court stated:

> > In a juvenile case, when there is evidence before the trier of fact that, upon its reasonable evaluation of credibility, furnished a factual basis for its finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Reasonable evaluation[s] of credibility and reasonable inferences of fact should not be disturbed upon review.

Further, when a defendant asserts a claim of self-defense, the burden lies on the State to establish beyond a reasonable doubt that the defendant did not act in self-defense. *State v. Alexander*, 04-788 (La.App. 3 Cir. 11/17/04), 888 So.2d 401 (citing *State v. Brown*), 414 So.2d 726 (La.1982)).

D.D. was charged with second degree murder, a violation of La.R.S. 14:30.1. That statute states, in pertinent part that "[s]econd degree murder is the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" Louisiana Revised Statutes 14:20 provides that a homicide is justifiable:

> (1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.

> (2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.

> . . . .

> C. A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using deadly force as provided for in this Section, and may stand his or her ground and meet force with force.

> D. No finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used deadly force had a reasonable belief that deadly force was reasonable and apparently necessary to prevent a violent or forcible felony involving life or great bodily harm or to prevent the unlawful entry.

D.D. contends that he had a reasonable fear for his own safety. According to D.D., it was known that Mr. Nelson was a good boxer. There was testimony that Mr. Nelson had formal boxing training and had won several fights. D.D. also argues that the evidence establishes that he believed that Mr. Nelson was armed, because Mr. Nelson had shown D.D. a pocketknife earlier in the day. Further, D.D. contends that the evidence shows that he reasonably believed that he was going to be "jumped" by the other boys.

However, the State offered testimony from five eyewitnesses, D.K.M., K.M., T.S., M.M., and D.M. Although there were slight variations in their testimony, they all testified to the same general sequence of events. All testified that the group, with the addition of Mr. Nelson and D.D., hung out at various locations in their neighborhood. There was testimony that Mr. Nelson and D.D. got in a fistfight because D.D. wanted Mr. Nelson's watch and cell phone. The witnesses further testified that Mr. Nelson bloodied D.D.'s lip and that D.D. lost the fight.

K.M., T.S., M.M., and D.M. testified that, after losing the fight, D.D. left the group and returned with a shotgun. According to their testimony, D.D. threatened to hit Mr. Nelson on the head with the gun, but was convinced to leave and put the gun away. However, D.D. returned a short time later. D.K.M., K.M., and M.M. testified that, when D.D. returned, he was smoking a "blunt." They also testified that D.D. stated something to the effect of, after he "hit the weed, [he was] going to kill him."

According to testimony, D.D. then approached the victim, pulled out a knife, and started swinging it at Mr. Nelson. D.K.M. at first testified that Mr. Nelson was not hitting D.D., but that he was "ducking and weaving." However, D.K.M. also stated that Mr. Nelson punched D.D. before D.D. stabbed him. K.M. testified that, until D.D. took out the knife, Mr. Nelson was swinging a t-shirt at D.D. and laughing. According to K.M., once D.D. took out the knife, Mr. Nelson started backing away from D.D. T.S. and M.M. both testified that, once Mr. Nelson saw the knife, he tried to run from it and was trying to block D.D.'s blows with his shirt. D.M. testified that Mr. Nelson "put up his fists" before D.D. took out the knife. The boys testified that, after D.D. stabbed Mr. Nelson, D.D. fled.

8

Although there was testimony that Mr. Nelson had a pocketknife earlier in the day, there was also testimony that Mr. Nelson no longer had the pocketknife at the time of his final encounter with D.D. The testimony was conflicting concerning D.D.'s knowledge that Mr. Nelson no longer had the pocketknife. Further, one witness, D.K.M., testified that he warned D.D. that the other boys were going to "jump" D.D. However, the other boys denied that they planned to do so.

The record reveals that the evidence, when viewed in a light most favorable to the prosecution, was sufficient to meet the State's burden of proof that D.D. did not act in self-defense. According to the record, after losing the initial fight, D.D. left the group at least once, if not twice. On both occasions, when he returned to the group, he had armed himself. Further, several of the witnesses testified that D.D. threatened to kill Mr. Nelson. There was no testimony that Mr. Nelson threatened D.D. with death or great bodily harm. To the contrary, two witnesses, D.K.M. and K.M., testified that Mr. Nelson was laughing immediately before D.D. took out the knife.

Thus, there is evidence in the record sufficient to support a finding that D.D. was the aggressor in his final encounter with Mr. Nelson. "A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict." La.R.S. 14:21. *See also State v. Loston*, 03-977 (La.App. 1 Cir. 2/23/04), 874 So.2d 197, *writ denied*, 04-792 (La. 9/24/02), 882 So.2d 1167.

The State submitted evidence sufficient to prove that D.D. was the aggressor in his final encounter with Mr. Nelson and, therefore, could not claim the right of

self-defense. Accordingly, we find no error in the trial court's finding that D.D. did not act in self-defense.

In relation to his assertion of self-defense, D.D. also contends that the trial court should have reduced the charge to manslaughter based on a theory of "imperfect self-defense." The first circuit addressed the concept of "imperfect self-defense" in *State v. Morris*, 09-422, p. 17 (La.App. 1 Cir. 9/11/09), 22 So.3d 1002, 1012, stating:

> The theory of the imperfect right of self-defense acknowledges that there are homicides which fall short of self-defense, but holds that those homicides should not constitute murder, where the defendant's honest but erroneous belief of imminent harm is less than reasonable. Louisiana law does not provide for any mitigating circumstance resembling the theory of "imperfect self-defense." *See State v. Johnson*, 98-1407, pp. 7-8 (La. App 1st Cir. 4/1/99), 734 So.2d 800, 805-06, *writ denied*, 99-1386 (La. 10/1/99), 748 So.2d 439.

As there is no provision for "imperfect self-defense" in Louisiana law, D.D.'s assertion to the contrary must fail.

This assignment of error is without merit.

*Intoxication*

D.D. also asserts that he was so intoxicated at the time of the offense that he could not form specific intent. According to D.D., he consumed enough marijuana and "Four Loko" (an alcoholic beverage that also contains caffeine) on the date of the offense that he could not form specific intent.

A defendant's voluntary intoxication may be asserted as a defense "where the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime." La. R.S. 14:15(2). "It is, however, an affirmative defense, and the burden is on defendant to prove by a preponderance of the evidence that he was in fact intoxicated at the time of the offense." *State v. Mack*, 45,552, p. 3 (La.App.

10

2 Cir. 8/11/10), 46 So.3d 801, 803. *See also State v. Bias*, 10-1440 (La.App. 3 Cir. 5/4/11), 63 So.3d 399, *writ denied*, 11-1063 (La. 11/14/11), 75 So.3d 939.

The record indicates that D.D. was interviewed the day after the stabbing. A DNA sample was taken at that time, but D.D.'s blood-alcohol content was not tested. The State's witnesses testified that D.D. consumed both marijuana and alcohol on the date of the offense, but their testimony concerning the amount and timing of D.D.'s consumption varied. D.M. and D.K.M. both testified that D.D. consumed one "blunt" and one can of Four Loko. M.M. testified that D.D. consumed two "blunts" and one can of Four Loko. Similarly, K.M. recalled that D.D. consumed three "blunts" and two cans of Four Loko. According to T.S.'s testimony, he could not recall what, if anything, D.D. consumed on that date. However, D.K.M., K.M., and M.M. did testify that, immediately before the stabbing, D.D. was smoking marijuana.

D.D. also offered the testimony of Dr. Donald Harper, an expert in the fields of neurology, psychopharmacology, and forensic neurology. The trial court limited the scope of Dr. Harper's testimony to hypothetical situations, stating that "this Court will decide whether that hypothetical does or doesn't fit that situation." Dr. Harper testified that a single Four Loko was the rough equivalent of five cans of beer plus two to three cups of coffee. According to Dr. Harper, hypothetically, two "blunts" and one can of Four Loko would have been sufficient to significantly intoxicate D.D. and affect his behavior and thinking. However, Dr. Harper conceded that he could not state with certainty the effect of those substances on D.D.'s behavior because of the unknown amounts and timing of the ingestion of those substances.

The trial court found that there was not sufficient evidence to show that D.D. was intoxicated such as to negate the formation of specific intent. To the contrary,

the trial court found that D.D.'s actions showed that he was capable of forming specific intent. The trial court stated:

> [T]he mere amount is not as relevant as the question of the behavior of this defendant, as to whether he – the intoxication precluded specific intent. And this defendant took two actions to indicate that he intended to – that he knew what he was doing and he intended to inflict great bodily harm or death upon the victim in this case.
>
> First of all, he clearly stated that he was going to kill him, which clearly indicates that he understood what he was going to do. And then he took two actions to try to do that. One time, he retrieved a weapon, a gun. He was talked into returning that. And then he came back – not only armed himself with a knife, but secreted the knife – hid it – so that the victim in this case would not know that he had come back with a weapon.
>
> All of that indicates sufficient forethought, planning, and understanding to clearly convince this Court, beyond a reasonable doubt, that the defendant in this case had specific intent to kill the victim in this case and did so when he stabbed him.

Given the surfeit of evidence indicating that D.D. was capable of "sufficient forethought, planning, and understanding" and the lack of evidence showing the amounts and timing of D.D.'s ingestion of any intoxicating substances, we find no error in the trial court's determination that D.D. was not so intoxicated that he could not form specific intent at the time of the offense. *See Bias*, 63 So.3d 399.

This assignment of error is without merit.

## DECREE

For the foregoing reasons, we affirm the juvenile defendant, D.D.'s, adjudication and disposition for the charge of second degree murder. We remand to the trial court with instructions to correct the minutes of the disposition hearing to accurately reflect the transcript of the disposition imposed by the trial court. Further, we instruct the trial court to inform D.D. of the provisions of La.Code Crim.P. art. 930.8 by sending D.D. appropriate written notice within ten days of

12

the rendition of this opinion and to file written notice in the record that D.D. received the notice.

**AFFIRMED.  REMANDED WITH INSTRUCTIONS.**