NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

22-80

STATE OF LOUISIANA IN THE INTEREST OF
C.N.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 33904
HONORABLE CYNTHIA CLAY GUILLORY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

CANDYCE G. PERRET
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Billy Howard Ezell, Candyce G. Perret, and Charles G. Fitzgerald, Judges.

ADJUDICATIONS AFFIRMED; DISPOSITION VACATED
AND REMANDED WITH INSTRUCTIONS.

**Bertha M. Hillman**
**Louisiana Appellate Project**
**222 North Vermont Street**
**Covington, LA   70433**
**(985) 209-2376**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **C.N.**

**Stephen C. Dwight**
**District Attorney**
**Dale R. Lee**
**Assistant District Attorney**
**John E. Turner**
**Assistant District Attorney**
**901 Lakeshore Drive, Suite 800**
**Lake Charles, LA   70601**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**PERRET, Judge.**

C.N.,[1] a juvenile, was adjudicated delinquent for inciting to riot resulting in death, a violation of La.R.S. 14:329.1, 14:329.2, and 14:329.7, and accessory after the fact to second degree murder, a violation of La.R.S. 14:25. C.N. appeals and alleges there was insufficient evidence to support the convictions. After review, we affirm the adjudications. However, we vacate the disposition and remand to the juvenile court with instructions to impose a separate disposition for each adjudication and enter into the record a written judgment of the dispositions in accordance with La.Ch.Code art. 903. Additionally, at the new disposition hearing, the juvenile court is ordered to advise C.N. of the time limitation for filing an application for post-conviction relief.

**FACTUAL AND PROCEDURAL HISTORY:**

On January 23, 2021, C.N. went to a movie theater in the late afternoon with two of her friends. They did not stay at the theater; instead, the girls walked to a nearby Walmart, then to an Academy sporting goods store.[2] When they returned to the theater, they encountered another group of approximately seven girls that included the victim, M.L ("M.L.'s group"). Girls in M.L.'s group made some insulting remarks, but C.N. and her friends left and walked to Walmart again. A fourth girl, R.B., met them there. C.N. had contacted R.B. to let her know M.L.'s group was in the area. Thereafter, the driver who was dropping R.B. off took all four girls back to the theater.

---

[1] Initials of the juvenile and the victim are used pursuant to La.R.S. 46:1844(W) and Uniform Rules—Courts of Appeal, Rule 5-2.

[2] Two of the girls C.N. was with stole a taser and mace from Academy but gave them away before the events at issue.

Once back at the theater, C.N. and her friends (hereinafter referred to as "R.B.'s group") decided to walk back to Walmart. M.L.'s group also went to Walmart at this point.[3] Apparently, M.L.'s group was outside of the store, calling for R.B to come fight. R.B.'s group, which included C.N., remained inside and asked a Walmart employee about obtaining some mace but they could not find any. The group then looked at kitchen knives, but finally decided to steal pocket knives. R.B. told C.N. and another girl, B.G., that she wanted to scare off the other girls. After taking the knives, M.L.'s group found a spot in the store to charge C.N.'s phone; while they did so, a friend called C.N. and told her that girls in M.L.'s group were on Instagram, online, stating they were about to fight. C.N. then activated her Instagram account to record and live stream events, titling the Instagram video feed "Fittin' to Fight."[4] M.L.'s group entered Walmart, and as M.L. approached R.B., the latter's group backed up. M.L. "ran up on" R.B., and the two girls traded punches. R.B. had the stolen pocket knife in her hand and stabbed M.L in the chest. Thereafter, R.B.'s group ran out of the store and got into a truck, which drove them back to the theater.[5] Extensive video evidence of the events, including Walmart surveillance videos as well as C.N.'s Instagram live stream, was admitted into evidence.

M.L. was treated at the scene by an officer who was providing off-duty security for Walmart at the time. M.L. was later pronounced deceased. Medical testimony showed that the cause of death was a stab wound to M.L.'s trunk.

---

[3] The trial testimony indicated that M.L.'s group arrived at Walmart ahead of C.N.'s group. However, the testimony was that C.N.'s group was not "hunting" or "chasing after" M.L.'s group.

[4] C.N. testified that the other girls' video had the same title.

[5] The driver of the truck was not identified.

After returning to the theater, R.B.'s group walked to Academy again to charge C.N.'s phone. R.B. bought slippers because she had lost her original footwear at Walmart. While at Academy, two of the girls were apprehended, but C.N. and R.B. remained at large. C.N. and R.B. attempted to elude police in an area neighborhood. Both were eventually apprehended and taken into custody.

On February 8, 2021, the Calcasieu Parish District Attorney's Office filed a petition alleging that C.N. should be adjudicated delinquent for inciting to riot resulting in death, a violation of La.R.S. 14:329.1, 14:329.2, and 14:329.7, and accessory after the fact to second degree murder, a violation of La.R.S. 14:25. The adjudication hearing began on May 13, 2021 and continued on May 14 and May 17. On May 20, the juvenile court adjudicated C.N. delinquent.[6]

On June 21, 2021, the juvenile court held a disposition hearing and ordered C.N. to serve four years in a secure facility. Subsequently, the court conducted two dispositional review hearings on October 4, 2021 and January 3, 2022; the court continued C.N. in secure placement.[7] C.N. now appeals, assigning one assignment of error: "The evidence is insufficient to support the convictions." C.N. also asserts two issues for review: (1) "The State failed to prove beyond a reasonable doubt that R.B. was guilty of second degree murder. R.B. acted in self defense or in the alternative could only be found guilty of manslaughter. Therefore, C.N. is not guilt[y] of accessory after the fact to second degree murder[;]" and (2) "The State failed to prove beyond a reasonable doubt that C.N. incited a riot."

---

[6] On May 17, the court recessed to May 20 due to inclement weather.

[7] Such hearings are required by La.Ch.Code art. 906(B).

3

**ERRORS PATENT:**

Although the Louisiana Children's Code is silent as to whether a juvenile criminal proceeding is entitled to an error patent review, this court has found that such a review is mandated by La.Ch.Code art. 104 and La.Code Crim.P. art. 920. *See State in the Interest of J.C.G.*, 97-1044 (La.App. 3 Cir. 2/4/98), 706 So.2d 1081. After reviewing the record, there are several errors patent as well as issues requiring discussion.

First, the petition, filed February 4, 2021, was filed more than forty-eight hours after the continued custody hearing held January 27, 2021, in violation of La.Ch.Code art. 843. The remedy for the untimely filing of the petition is release. La.Ch.Code art. 843(B). However, once a juvenile is adjudicated a delinquent, the issue of timeliness becomes moot. *State in the Interest of J.L., Jr.*, 592 So.2d 435 (La.App. 5 Cir. 1991), *writ denied*, 597 So.2d 1031 (La.1992). Accordingly, no action is required as the issue is now moot.

Next, C.N.'s place of birth was not listed in the petition as required by La.Ch.Code art. 845. This is a defect as to form only, and C.N. has alleged no prejudice as a result; thus, the error is harmless. La.Ch.Code art. 845(B); *State in the Interest of D.D.*, 11-1384 (La.App. 3 Cir. 3/7/12), 86 So.3d 171.

Furthermore, the juvenile court failed to advise C.N. of her rights at the appearance to answer the petition as required by La.Ch.Code art. 855. Article 855 requires the court to first determine if the child is capable of understanding statements about his or her rights and then to advise the juvenile of the nature of the proceedings, the nature of the allegations of the petition, the right to an adjudication hearing, the right to appointed counsel, the privilege against self-incrimination, the range of authorized responses, and the possible consequences of

4

his or her admission that the allegations are true, including the maximum and minimum dispositions which may be imposed. However, the record indicates that C.N. was represented by counsel and denied the allegations. Accordingly, the error is harmless. *See State in Interest of D.B.,*13-1364 (La.App. 3 Cir. 4/23/14), 137 So.3d 1282, *writ denied*, 14-1092 (La. 1/9/15), 157 So.3d 596.

The adjudication hearing was also not timely held. Louisiana Children's Code Article 877 provides, in pertinent part:

> A. When the child is charged with a crime of violence as defined in R.S. 14:2(B) and the child is continued in custody pursuant to Chapter 5 of this Title, the adjudication hearing shall commence within sixty days of the appearance to answer the petition. In all other cases, if the child is continued in custody pursuant to Chapter 5 of this Title, the adjudication hearing shall commence within thirty days of the appearance to answer the petition.
>
> . . . .
>
> D. For good cause, the court may extend such period.

Although not listed in La.R.S. 14:2(B) as a crime of violence, "this list of enumerated crimes is merely illustrative, not exhaustive, [and] unlisted offenses may be denominated as crimes of violence under the general definition of the term as provided by the statute." *State v. Oliphant*, 12-1176, p. 8 (La. 3/19/13), 113 So.3d 165, 170. A "crime of violence" is defined as:

> an offense that has, as an element, the use, attempted use, or threatened use of physical force against the person or property of another, and that, by its very nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense or an offense that involves the possession or use of a dangerous weapon.

La.R.S. 14:2(B). A riot is defined in La.R.S. 14:329.1 as:

> a public disturbance involving an assemblage of three or more persons acting together or in concert which by tumultuous and violent conduct, or the imminent threat of tumultuous and violent conduct,

5

results in injury or damage to persons or property or creates a clear and present danger of injury or damage to persons or property.

Furthermore, inciting to riot is defined in La.R.S. 14:329.2 as "the endeavor by any person to incite or procure any other person to create or participate in a riot." Thus, we conclude that inciting to riot meets the definition of a crime of violence; therefore, the adjudication hearing was required to commence within sixty days of the appearance to answer the petition, which it did not. The answer hearing was held on February 8, 2021, and the adjudication hearing commenced May 13, 2021. However, at the February 8, 2021 answer hearing on the motion of the State, the court ordered the adjudication hearing set for April 5, 2021. On April 5, 2021, defense counsel requested a continuance, and when asked by the State if the defense would waive the delays until the next trial setting, defense counsel agreed. The matter was continued and fixed for May 18, 2021. Two days later, on motion of the State, the matter was fixed five days earlier, for May 13, 2021, the date the adjudication ultimately commenced. Since C.N. did not object to the setting of the hearing outside of the time period, actually moved for the continuance, and waived delays until the next trial setting, we find that the time period was extended for good cause, and that no error patent should be recognized. *See State in the Interest of K.K.*, 14-479 (La.App. 3 Cir. 12/17/14), 153 So.3d 1280, and *State in the Interest of S.D.,* 13-1028 (La.App. 3 Cir. 2/12/14) (unpublished opinion).

Finally, the disposition imposed was indeterminate as separate dispositions for each offense were not imposed. C.N. was adjudicated delinquent based on her commission of inciting to riot and accessory after the fact to second degree murder. The court sentenced her to the Louisiana Department of Public Safety and

6

Corrections, Office of Juvenile Justice, in a secure facility for a period not to exceed four years with review in ninety days to determine whether her educational, medical, and mental health needs were being met.

The failure to impose separate dispositions for each convicted offense is an error patent in violation of La.Ch.Code art. 104 and La.Code Crim.P. art. 879. *State in the Interest of S.C.J.*, 09-1272 (La.App. 3 Cir. 2/3/10), 28 So.3d 1206, *writ denied*, 10-496 (La. 4/5/10), 31 So.3d 363; *State in the Interest of J.G.*, 94-194 (La.App. 5 Cir. 7/26/94), 641 So.2d 633. Although there is no provision in the Children's Code requiring the disposition to be determinate, La.Ch.Code art. 104 provides in pertinent part:

> Where procedures are not provided in this Code, or otherwise by law, the court shall proceed in accordance with:
>
> (1)    The Code of Criminal Procedure in a delinquency proceeding and in a criminal trial of an adult.

Louisiana Code of Criminal Procedure Article 879 provides for the imposition of a determinate sentence when a defendant is sentenced to imprisonment. Separate sentences must be imposed for more than one conviction. *State v. Hongo*, 625 So.2d 610, 612 (La.App. 3 Cir. 1993), *writ denied*, 93-2774 (La. 1/13/94), 631 So.2d 1163. This court has previously held that error patent occurs when a separate disposition is not imposed for each adjudicated offense in a juvenile case, citing La.Code Crim.P. art. 879 as authority. *State in the Interest of L.D.L., Jr.*, 98-794 (La.App. 3 Cir. 10/28/98) (unpublished opinion), and *State in the Interest of R.D.B.*, 98-773 (La.App. 3 Cir. 10/28/98) (unpublished opinion). *See also State in the Interest of E.M.*, 18-171 (La.App. 1 Cir. 6/1/18) (unpublished opinion), *writ denied*, 18-1097 (La. 7/16/18), 247 So.3d 118, where the first circuit

7

found the trial court's failure to impose a separate disposition on each adjudication rendered the disposition indeterminate.

Considering the foregoing, we vacate the disposition and remand for the juvenile court to impose a separate disposition for each adjudication and to enter into the record a written judgment of the dispositions in accordance with La.Ch.Code art. 903.

Lastly, Louisiana Code of Criminal Procedure Article 930.8 requires the trial court to inform a defendant at sentencing that he has two years from the finality of his or her conviction and sentence to file an application for post-conviction relief. Although the Louisiana Children's Code contains no similar provision, this court has required this notice be given to juveniles. *See State in the Interest of C.C.H.*, 21-19 (La.App. 3 Cir. 5/5/21), 319 So.3d 940; *State in the Interest of R.J.H.*, 21-20 (La.App. 3 Cir. 5/5/21), 319 So.3d 964; *State in the Interest of J.J.M.*, 16-347 (La.App. 3 Cir. 11/9/16), 207 So.3d 609.

Accordingly, the juvenile court is ordered, at the new disposition hearing, to advise C.N. of the time limitation for filing an application for post-conviction relief.

**ASSIGNMENTS OF ERROR:**

C.N. asserts two issues for review through counsel, but both are assertions that the evidence adduced at the adjudication hearing was insufficient to support the two adjudications of delinquency.

The general test for sufficiency is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307,

8

99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Regarding delinquency adjudications, the supreme court explained the hybrid nature of such sufficiency reviews in a per curiam reversing an appellate court's assessment:

Finally, the court of appeal emphasized that juvenile delinquency proceedings are essentially civil in nature, *State in the Interest of Batiste*, 367 So.2d 784, 789 (La.1979), and that review of a delinquency adjudication is therefore subject not only to the due process standard of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), but also to a broader standard by which an appellate court reviews both the facts and law, specifically, the trial court's factual findings, for clear or manifest error, "to determine whether there is sufficient evidence to satisfy the standard of proof beyond a reasonable doubt." [*State in the Interest of* ] *C.D.*, 11-0121, p. 6[ ][La.App. 4 Cir. 6/29/11),] 69 So.3d [1219,] [ ] 1223 (citation omitted). Given the loose ends in the state's case, the court of appeal concluded "the trial court was clearly wrong in determining that the state had proven the identification of C.D. beyond a reasonable doubt." *Id.*, 11-0121 at 10-11, 69 So.3d at 1224-25.

However, as a matter of due process, the court of appeal erred in losing sight of the basic principle on review that the rational fact finder test of *Jackson v. Virginia*, "does not permit a reviewing court to substitute its own appreciation of the evidence for that of the [fact finder]." *State v. Lubrano*, 563 So.2d 847, 850 (La.1990) (citing *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983)). Thus, an appellate court should ordinarily not assume "the role of the fact-finder to weigh the respective credibilities of the witnesses" and thereby "second guess the credibility determinations of the trier of fact beyond . . . sufficiency evaluations under the *Jackson* standard of review." *Graffagnino*, 436 So.2d at 563.

9

. . . .

Argument of counsel at the close of the hearing brought all of the circumstances considered by the court of appeal to the attention of the juvenile court, including discrepancies in the defense case with respect to where and how defendant spent the afternoon before his arrest and whether defendant did, or (in his opinion) did not resemble anyone else in the Fischer Housing Development. In the end, the juvenile court found Dobard's testimony sufficient to negate any reasonable probability of misidentification and because that credibility determination appears rationally based on the evidence presented at the adjudication hearing, the court's finding forecloses second guessing by an appellate court under the rational fact finder test of *Jackson v. Virginia*. Moreover, even under a broader, civil standard of review, we find no clear or manifest error in the trial court's credibility determination. *See Rosell v. ESCO*, 549 So.2d 840, 844-45 (La.1989) ("When findings are based on determinations regarding the credibility of witnesses, the manifest error—clearly wrong standard demands great deference to the trier of fact's findings. . . . [unless] documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story. . . . a factfinder's finding . . . based on its decision to credit the testimony of one of two or more witnesses . . . can virtually never be manifestly erroneous or clearly wrong.") (citing, *inter alia*, [*State v.*] *Mussall* [523 So.2d 1305, (1988)]); *see also Foley v. Entergy Louisiana, Inc.*, 06-0983, p. 10 (La.11/29/06), 946 So.2d 144, 153 ("If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.") (citation omitted).

*State in the Interest of C.D.*, 11-1701, pp. 5-6, 8-9 (La. 7/2/12), 93 So.3d 1272, 1276, 1277-78.

In her first assignment of error, C.N. argues the State did not prove that she was an accessory after the fact to second degree murder. Louisiana Revised Statutes 14:25 defines "accessory after the fact" as:

An accessory after the fact is any person who, after the commission of a felony, shall harbor, conceal, or aid the offender, knowing or having reasonable ground to believe that he has committed the felony, and with the intent that he may avoid or escape from arrest, trial, conviction, or punishment.

10

An accessory after the fact may be tried and punished, notwithstanding the fact that the principal felon may not have been arrested, tried, convicted, or amenable to justice.

Although C.N. recites the elements of accessory after the fact found in La.R.S. 14:25, she focuses solely on the requirement that a felony must be committed, arguing only that the State failed "to prove the guilt of the principal [R.B.] beyond a reasonable doubt." To this point, C.N. argues R.B. did not commit second degree murder because the killing was justified, or, alternatively, was manslaughter. Implicit in C.N.'s arguments of self-defense and manslaughter is the acknowledgement that a homicide occurred.

Second degree murder is defined by La.R.S. 14:30.1, which states in pertinent part:

A. Second degree murder is the killing of a human being:

(1) When the offender has a specific intent to kill or to inflict great bodily harm[.]

Justifiable homicide is defined by La.R.S. 14:20, which states in pertinent part:

A. A homicide is justifiable:

(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.

(2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.

As already mentioned, C.N. acknowledges that R.B. killed M.L. by stabbing her with the knife. However, C.N. urges that the homicide at issue was justified as

11

self defense. C.N. notes testimony by B.G. that the girls in their group armed themselves simply to scare the other girls away. Further, B.G. noted that they were backing up when the altercation began. Thus, C.N, argues that R.B. was not the aggressor, and, instead, was being "taunted and followed by seven girls who announced on social media that they wanted to fight."

In discussing killing in self-defense, this court has explained:

Defendant does not deny that he shot and killed the victim, nor did he deny it at trial. Rather, he argues that the State failed to disprove that he acted in self-defense. Killing in self-defense is governed by La.R.S. 14:20(A), which states, in pertinent part, "[a] homicide is justifiable: (1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." (Emphasis added).

Defendant contends that the killing was justifiable because he had his back against the wall, and was surrounded by the victim and the victim's two friends, Doucet and Jones. Further, he contends that shooting the victim was the only way he could escape.

The Defendant's claim that Jones had a firearm was disputed by both Doucet and Jones at trial. The evidence given by his own mother defeats his claim of justifiable self-defense. The essence of his defense is that he was justified in responding to an attempted punch by shooting his opponent in the chest at close range. We recognize that Dejean had two friends with him. Thus, Defendant may have genuinely felt endangered; further, some level of fear was objectively reasonable. However, the level of force he used to defend himself was far beyond what was necessary under the circumstances.

In the context of self-defense in a manslaughter prosecution, our court has observed in *State v. Griffin*, 06-543, pp. 12, 14 (La.App. 3 Cir. 9/27/06), 940 So.2d 845, 851, 854, *writ denied*, 07-2 (La.9/14/07), 963 So.2d 995, the following:

The State had the burden of proving the Defendant did not stab Marcus Conway in self-defense; therefore, we must determine whether the Defendant reasonably believed that he was in imminent danger of losing his life or receiving great bodily harm and that killing Marcus was necessary to save himself from that danger. The standard in La.R.S. 14:20 is whether the Defendant's subjective belief that he was in danger was reasonable.

12

> *State v. Brown*, 93-1471 (La.App. 3 Cir. 5/4/94), 640 So.2d 488.
>
>> Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary are the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character. *State v. Hardeman*, 467 So.2d 1163 (La.App. 2d Cir.1985). Although there is no unqualified duty to retreat, the possibility of escape is a factor to consider in determining whether a defendant had a reasonable belief that the use of deadly force was necessary to avoid the danger. *State v. Brown*, 414 So.2d 726 (La.1982).
>
> *State v. Spivey*, 38,243, p. 6 (La.App. 2 Cir. 5/12/04), 874 So.2d 352, 357.

*State v. Mincey*, 08-1315, pp. 2-3 (La.App. 3 Cir. 6/3/09), 14 So.3d 613, 615.

In this case, there was no evidence that M.L. or any of the girls in her group were armed. B.G. testified that she did not see any of the girls in that group with any weapons. C.N. testified that she saw no knife in M.L.'s hands, although M.L. had her hands up, ready to fight. Based on the record, it is clear that R.B. stabbed an unarmed person. Thus, even if the victim was advancing on R.B., the latter's response used disproportionate force in response and the homicide was not justified. In light of *Mincey*, we conclude that R.B.'s act of killing of M.L. was not justified pursuant to La.R.S. 14:20. Thus, justification does not negate C.N.'s adjudication as an accessory.

Regarding her alternative argument that R.B. was guilty of manslaughter rather than second degree murder, similar reasoning applies. Manslaughter is defined by La.R.S. 14:31, which states in pertinent part:

A. Manslaughter is:

(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

As the second circuit has discussed:

The question now before this court is whether Garrett's provocation of Defendant was sufficient to deprive an average person of self-control and cool reflection thereby causing Defendant to act in sudden passion or heat of blood, which would reduce the charge to the lesser responsive charge of attempted manslaughter. The record indicates that Garrett was the initial aggressor who admitted that he armed himself with a metal rod, threatened Defendant and struck first after being given a "threatening look." Garrett's role as the aggressor, however, quickly reversed when the shower rod came apart and he began to retreat. Defendant testified that, when the rod came apart, he began hitting Garrett until he backed up and fell, at which point Defendant continued to hit him at least three more times.

A trier of fact could reasonably conclude that an average person would not be so angered by this quick, ineffective attack that he would lose all self-control and cool reflection and start slashing another man's throat. Further, Defendant admitted in his testimony that he was not so angry that he could not control himself. We are also not persuaded by Defendant's argument that he did not have enough time to calm down during the short chase before the attack; an average person would not have reacted in such a violent manner.

Accordingly, we find the evidence in this case sufficient to support Defendant's conviction of attempted second degree murder and, further, that Defendant failed to carry his burden necessary to reduce the conviction to attempted manslaughter.

*State v. Logan*, 45,136, pp. 12-13 (La.App. 2 Cir. 4/14/10), 34 So.3d 528, 536, *writ denied*, 10-1099 (La. 11/5/10), 50 So.3d 812.

The "fight" described by B.G. and C.N., and depicted on Walmart security videos, was between an unarmed girl and a girl with knife. There was no evidence that M.L. had any intention of escalating the altercation beyond a fistfight. As in *Logan*, a factfinder could reasonably conclude that an average person would not

14

lose self-control and stab another person under these facts.  Thus, we find the State proved the underlying felony beyond a reasonable doubt—that R.B. committed second degree murder—and further, that C.N. was an accessory to second degree murder.

For the reasons discussed, C.N.'s arguments that she is not an accessory to second degree murder lack merit.

As for the second offense, C.N. argues that the evidence adduced by the State did not support its delinquency adjudication for inciting to riot.  Inciting to riot is defined by La.R.S. 14:329.2 as "the endeavor by any person to incite or procure any other person to create or participate in a riot."  As previously stated, "riot" is defined by La.R.S. 14:329.1 as:

> [A] public disturbance involving an assemblage of three or more persons acting together or in concert which by tumultuous and violent conduct, or the imminent threat of tumultuous and violent conduct, results in injury or damage to persons or property or creates a clear and present danger of injury or damage to persons or property.

C.N. argues that the evidence at the adjudication proceeding did not establish that she took any action to incite or procure other people to engage in the altercation at issue.  C.N. admitted on cross-examination that she and R.B. texted one another after C.N. saw M.L.'s group at the theater:

> Q. . . . . "Okay. So, when I come, we fighting. Then we leaving"? That's what R.B. texted you, right?
>
> A. Oh, yes, sir.
>
> Q. So, that's before the stabbing, right?
>
> A. Yes, sir.
>
> Q. So, you saying that you didn't know you were going to fight before you got to Walmart isn't true, is it?

A.     I didn't know what she - - at first I didn't know what she was talking about, but then whenever we seen - - whenever we seen the girls, that's when we knew.

Q.     Okay. When you saw the girls when?

A.     When we was at the movies.

C.N. also acknowledged that she went live on Instagram before the incident. She also testified that she understood that her initial contact with R.B. to let her know that M.L.'s group was at the theater "set all this into motion," as the prosecutor put it. However, C.N. also stated that she did not know at the time that the initial contact with R.B. would cause events to unfold in the way they did.

In response, the State cites a case from this court:

Defendant asserts that on May 17, 2012, he was jumped and severely beaten by individuals known as "the Crowley boys." As a result, he "decided to confront" the boys for "a fair fist fight" the next night. En route to the apartment where the boys apparently lived, Defendant was joined by Lee Hill. Defendant asserts that Lee Hill armed himself "without encouragement or procurement" by Defendant, and that Hill acted on his own when he began firing a gun indiscriminately outside the residence of the Crowley boys. Defendant acknowledges the shooting "may have resulted in the death of Ray Ryan."

. . . .

Though Ms. Johnson's testimony [State witness] was questionable at points, her testimony nonetheless provided support for the proposition that Defendant ordered a group of three or more persons to "surround" the apartment (though she claimed to have intervened and prevented such from happening) and that Defendant ordered an unspecified number of people to run up the stairs and later to shoot at the apartment. While Mr. McMahon's testimony did not fully corroborate Ms. Johnson's with respect to Defendant's "orders" or "commands," he did agree with the State's suggestion that Defendant was the leader of the group.

Defendant's statement to the authorities provided some additional support, as Defendant himself admitted that he discussed the fight with several others before it occurred. We cannot say that discussing a fight is necessarily proof of incitement, especially since the fight did not occur immediately thereafter. He often used the

16

word "we" when referring to the anticipated fight, though he claimed to have later decided he would handle the matter on his own. Nonetheless, both Teri Johnson and Kenneth McMahon described a large group, twelve to twenty people, moving towards the scene on the night of the incident. While Defendant recalled walking over with only his girlfriend and her brother, he also claimed to have been heavily intoxicated and had even "blacked out" earlier in the day.

*State v. Johnson*, 15-843, pp. 1-2, 14-15 (La.App. 3 Cir. 3/2/16), 186 So.3d 348, 349, 356, *writ denied*, 16-667 (La. 4/7/17), 218 So.3d 108.

The State summarizes its argument as follows:

> In the instant case, C.N. clearly knew that R.B. wanted to fight some of the girls in the other group who were present. She clearly told R.B. of the girls' presence, and she was clearly aware of R.B.'s intent when she arrived. She was cooperative to the point of procuring weapons, which escalated a potential fist fight into a deadly encounter. To constitute a riot one has to create a public disturbance (such as a fight involving at least four girls on one side and at least seven on the other) involving an assemblage of three or more persons acting together or in concert (there were initially three in C.N.'s group until she texted R.B. which made four with perhaps others on the way) which by tumultuous and violent conduct, (a stabbing) or the imminent threat of tumultuous and violent conduct, results in injury of damage to persons (the death of M.L.) or property or creates a clear and present danger of injury or damage to persons or property (four girls armed with knives before a fist fight creates a clear and present risk of injury.)
>
> . . . .
>
> There is certainly more evidence of her guilt than the defendant in the ***Johnson*** case.

We note that the weakness of the State's case in *Johnson* was related to the credibility of the prosecution's chief witness. In the present case, credibility is not at issue. In the briefs, as at the adjudication hearing, there does not appear to be a disagreement regarding the underlying facts. Instead, the difficulty in the present case lies in ascertaining whether the proven facts match the statutorily prescribed elements of the crime, pursuant to *Kennerson*, 695 So.2d 1367, and *C.D*, 69 So.3d 1219.

17

Regarding such a sufficiency analysis, *Johnson* was actually a stronger case, as it included evidence that the defendant actually issued orders to the group involved in his offense. There can be little doubt that the act of giving commands to a group, exhorting it to violent or disruptive action, is equivalent to "inciting" or "procuring" said group. We have found little guidance other than *Johnson* but note a statement from a Louisiana Supreme Court case that pre-dates *Jackson v. Virginia*: "For speech to constitute this conduct of inciting to riot, it must be a willful, intentional 'endeavor' to gain as an immediate result, and specifically from that speech, the participation of three or more persons in combination to do violence." *State v. Douglas*, 278 So.2d 485, 487 (La.1973).

The evidence in the current case shows that C.N. went to a movie theater with two other girls. Apparently, R.B. initiated the plan to go to the movie theater that day, but did not arrive for quite some time. C.N. and the other two girls encountered M.L.'s group who had some prior disagreement with R.B., and C.N. contacted R.B. to let her know M.L.'s group was there. R.B. responded that she was on the way and that she intended to fight. After R.B. arrived, she and C.N., along with two other girls, went to Walmart. M.L.'s group, who was also at Walmart, challenged R.B to come outside. The latter contacted her sister to come, and the group inquired about getting mace. When they were unsuccessful, R.B.'s group, including C.N., armed themselves with folding knives. After receiving a phone call that M.L.'s group was live streaming on Instagram, C.N. also initiated a live stream titled "Fittin to Fight[.]" Subsequently, R.B. and M.L. had an altercation and R.B. stabbed M.L., killing her.

The evidence against C.N. falls short of the level of proof reached in *Johnson*, as there is no indication that C.N. exerted any level of command or other

conscious direction of the events at issue. In the terms set forth in *Douglas*, it seems questionable that C.N.'s actions constituted a "willful, intentional endeavor to gain as an immediate result . . . the participation of three or more persons in combination to do violence." B.G. testified at the adjudication hearing and stated that C.N. did not go to Walmart to fight. C.N. testified that the group planned to meet at the movies that morning and that C.N. and the other two girls were waiting on R.B when they first encountered M.L.'s group.

However, after C.N. texted R.B. that M.L.'s group was at the theater, R.B. indicated there would be a fight and R.B. procured a ride to meet C.N. C.N. admitted setting in motion the tragic events at issue. The factfinder could rationally have determined that C.N. knew that a group fight would develop from her initial contact with R.B., as the latter had animosity toward some of the other girls. The other group had about seven girls; C.N. was with two other girls and R.B. joined them due to C.N.'s contact. C.N. knew that R.B. intended to fight and that R.B. had contacted her sisters to come.

For the reasons discussed, we affirm the adjudication based on the offense of inciting a riot.

**DECREE:**

For the foregoing reasons, C.N.'s adjudications are affirmed. However, this court vacates the disposition and remands for the juvenile court to impose a separate disposition for each adjudication and to enter into the record a written judgment of the dispositions in accordance with La.Ch.Code art. 903. At the new disposition hearing, the juvenile court should advise C.N. of the time limitation for filing an application for post-conviction relief in accordance with La.Code Crim.P. art. 930.8.

19

**ADJUDICATIONS AFFIRMED; DISPOSITION VACATED AND REMANDED WITH INSTRUCTIONS.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.